We'll hear argument first this morning in Case 17-494, South Dakota v. Wayfair. General Jackley? Mr. Chief Justice, and may it please the Court, there are two very significant consequences brought about by Quill. First, our states are losing massive sales tax revenues that we need for education, health care, and infrastructure. Second, our small businesses on Main Street are being harmed because of the unlevel playing field created by Quill, where out-of-state remote sellers are given a price advantage. I'm sorry, isn't the problem not Quill, but the fact that you don't have a mechanism to collect from consumers? It's not the merchants who are paying the sales tax, it's the consumer. They're collecting it for you. So find a way to collect from them. Justice Sotomayor, we believe that we have a right because we have a statutory scheme in place that is non-discriminatory. There aren't apportionment issues. It's a fair scheme. It has safe harbors in place to allow our state to use— Sotomayor's scheme, but I'm not concerned about your scheme as such. I'm concerned about the many unanswered questions that overturning precedents will create a massive amount of lawsuits about. I know you've told us that Quill has created its own set of lawsuits. I guess every law does. But here there are some significant ones. You're not retroactive, but your adversaries point out that there are many states who have already made this collection retroactive. So we have that question. We have questions about what's the contact that you have to do to impose this obligation? Are we going to decide it under complete auto? Are we going to decide it under pike? Balancing how much contact is enough to justify placing this obligation on an out-of-town seller. So there's going to be a host of questions. What happens when the tax program breaks down, as it already has for the states who are using it, and merchants can't keep track of who they've sold to? All of these are questions that are wrought with difficulties. So you're introducing now a whole new set of difficulties to put behind something that's been in place for 30 years now? Justice Sotomayor, we would encourage using the doctrines that are already in place with complete auto when it comes to a tax assessment, to look for discrimination, to look for apportionment issues, to look at that substantial nexus. How about economic? Certainly economics can be addressed by pike. Pike is a balancing test that this Court uses for its dormant commerce clause and commerce clause effect. It is able to take a look at the actual. So how many sales does it take? You're at 200,000, I believe, or 200 sales, and I don't remember the monetary amount. But what's the minimum? In South Dakota, it's set at 200. I know what it was set at. It still doesn't answer the question. What's the minimum everywhere else? The minimum would be one sale, because if you look at complete auto, that creates the nexus. So what are we going to do with the costs that you're going to put on small businesses? The small businesses are the ones that are affected most by Quill. If you look at that small business on Main Street, it is that business that is put at a price disadvantage because of Quill. Actually, they're put at disadvantage not by Quill, but by the fact that there are massive discount sellers, not just on the Internet, but even in stores now. I'm talking about the added cost of doing business with a small businessman. Someone, one of the briefs said it was a $250,000 cost to implement one of these sales programs, one of these sales tax programs. That brief left out that it begins, it's to scale, and it begins at $12 a month for 30 transactions. When you look at the cost associated with collection, it really depends. That doesn't include auditing. It doesn't include integrating the program with the existing sales program of the company. It doesn't account for the maintenance of the program. There's lots of costs that are inherent in a process of this type. One thing to look at is the fact that all these sellers, at least in the 45 states with the sales tax, already have a collection and a remittance obligation and already have in place the software that is able to calculate. I'm sorry. There's five states that don't centralize the state and local. With those five states, as is indicated from the briefing, it's to scale, and it begins at $12 a month for 30 transactions. And I think the important thing to look at when it comes to burden is quill and the physical presence doesn't address that issue. It doesn't address that issue because as shown in National Geographic, you may have a situation where there's a warehouse, there's goods at a warehouse in a particular locality, where it will still trigger the sales tax obligation. Well, but did I understand you to acknowledge that there would be a constitutional minimum with respect to the burdens? In other words, that some businesses would not, you could not impose the obligation on some small businesses? Mr. Chief Justice, certainly that's what PIKE is for, is to determine in a balancing if there is a constitutional concern, if there is a Commerce Clause concern. Well, in anything, other areas you just mentioned, I don't know that we've recognized a lowest level for things like a physical presence, right? I mean, isn't it one person, one building? So that would be another special rule in this context, wouldn't it? You know, certainly that's one way to look at it, yes, that when you look at the burdens and you look at really physical presence, there are a lot of things that can trigger it. It can be a building, a warehouse. It can be a traveling salesperson that comes to visit in South Dakota at Mount Rushmore, and there's a sale. The other important thing to look at when it comes to burden is the state schemes that are being put in place, such as in Colorado, with the notice and the reporting requirement, those are burdens that are of equal or perhaps even greater than a simple collection and remittance of a tax. If you have – if there are two options, let's say option A is eliminate QUIL and States can do whatever they want with respect to retroactive liability and with respect to the minimum number of sales that are required in the State in order for the sales to be taxed, in order to require them to collect the tax, that's option A. Option B is a congressional scheme that deals with all of these problems. If those are the only two options, which is preferable? Option A. The reason for option A is this. Congress has had 26 years to address this issue. And it's not Congress, but it's QUIL. It's this Court's decision that is striking down our State statutes. Kagan. Usually when somebody says something like that, that Congress has not addressed an issue for 25-plus years, you know, it gives us reason to pause because Congress could have addressed the issue and Congress chose not to. This is not the kind of issue where you say, well, probably didn't get on Congress's radar screen or maybe Congress was too busy doing other things. This is a very prominent issue which Congress has been aware of for a very long time and has chosen not to do something about that. And that seems to make your bar higher to surmount, isn't it? This is a constitutional interpretation. And one way to look at Congress is what was just announced by the Court today, the Microsoft decision. Sometimes the activity of this Court will spur Congress to act. It did in the Microsoft situation. But in this instance, it hasn't. Ginsburg. That was, Microsoft was just a statutory interpretation question where we might expect Congress to come in. But here, I take it that your point is, well, right or wrong, was this Court's decision. And if time has, and changing conditions have rendered it obsolete, why should the Court, which created the doctrine, say, well, we'll let Congress fix up what turns out to be our obsolete precedent? I think that's your point. It is, Justice Ginsburg. Because that's your answer. Isn't it normal that we treat a dormant commerce clause case the same way we treat statutes? I mean, I think the examples are Legion. Congress cannot overturn constitutional decisions, but in the dormant commerce clause case, it's different. And, of course, they can. And, of course, they do. So I don't really see a difference there. So what's the difference? Justice Breyer, I would still say there's a difference because this is a constitutional interpretation. No, no, but the word constitutional is not magic. The reason that we say we are more willing to overturn a constitutional case is because Congress can't act. But here, they can act. And, therefore, there is no reason for treating it specially. What is the response to that? I think the reason to treat it special is because we have a situation where Congress has had 26 years. Well, we have briefs from three senators and Congressman Goodlatte that says Congress was about to act. And, indeed, what stopped them from acting was our decision to decide this case. Now, that's their view of it. And between whether they know or whether I know, I guess they have a better view. They're members of Congress. And they point to many statutes. And you are 50 states. If you do not have the power to get Congress to do something, I don't know who would. Congress doesn't have an incentive in this instance to take action in something that could be perceived as a tax when yet they don't get the opportunity to use the revenue. Well, as things stand now, it seems that both the states and Internet retailers have an incentive to ask for a congressional solution to this problem. So the Internet retailers will have to deal with statutes like the Colorado reporting statute and with aggressive moves by the states to try to bring taxation within Quill in some way. And the states obviously have an incentive to require retail, Internet retailers to collect the tax. So there are incentives on both sides. But if Quill is overruled, what incentives do the states have to ask for any kind of congressional legislation? Well, certainly if Quill is overruled, the states will have their constitutional responsibilities to follow complete auto and to follow pike. I mean, what really has happened here is in Quill, this court set the default. It set the baseline. So where a state statute, as nondiscriminatory as it may be and as reasonable as it may be, such as South Dakota's, it's automatically unconstitutional and struck down. Can I ask you the questions, two or three brief questions. You answer them when you wish and if you wish. And the reason I'm asking like this is because I read through these briefs. When I read your briefs, I thought absolutely right. And then I read through the other briefs and I thought absolutely right. And you cannot both be absolutely right. All right. So why is it? Question one, you have wildly different estimates of costs, revenues, and what states are losing or not. How do I find? And other things. Can you do this on the Internet? They say there are 12 mistakes, even in South Dakota. All right. Or not. That's question one. How do I find out? You have a list here of, I would say, they do, of six or eight really tough practical decisions, retroactivity, all kinds of things like that. How do we deal with that? Okay? I would like to know the answer to that. And you've already dealt with one, which is, well, I'll put it specifically. What's the standard? What's the standard? The government says physical presence. Huh. Any? What? Okay. So those were my three questions. Anytime you want to deal with them or if you want to deal with them, do so. Use respondents' numbers. It's $100 billion over the next 10 years. Use respondents' activity. We know they collect in, Wayfair collects in 22 states. They do this. In fact, Quill.com now collects in every state. So those numbers show that they do this. Use the GAO to show that, of course, you can do this. Companies do this every day. Systemax, who was originally a defendant in this case, no longer is a defendant because overnight they simply switched over. When it comes to retroactivity, the states don't want to address this retroactively, which is why South Dakota, illustrative of that, has indicated we're perspective only. In the briefing, 38 other states have indicated their laws would prevent retroactivity. And it's difficult. And that is something that Congress could take care of if we overturn Quill. Absolutely. In fact, in terms of the economic impact, I mean, the suggestion in some of the briefs is that this is a problem that has peaked in the sense that the bigger e-commerce companies find themselves with physical presence in all 50 states. So they're already covered. And the workarounds that some of the states have employed are also bringing more  And if it is, in fact, a problem that is diminishing rather than expanding, why doesn't that suggest that there are greater significance to the arguments that we should leave Quill in place? Mr. Chief Justice, because I think it's because of e-commerce. E-commerce is now 9% of the market, and it's rapidly growing. If you look at the numbers, it's been challenging for the states to collect on that e-commerce. The collection rate is as low as 40. Sure. E-commerce is expanding, and companies like Amazon account for a large part of that. But they're already collecting in all 50 states. And that's the problem. It's not that e-commerce is expanding. It is, from your point of view, I think, the problem you have to address is that the coverage in terms of collecting the taxes is expanding as well. Mr. Chief Justice, certainly it's expanding. But what remains is that $100 billion loss over the next 10 years. Mr. Chief Justice, if I may please reserve the remainder of my time. Thank you, Counsel. Thank you. Mr. Stewart. Mr. Chief Justice, and may it please the Court, I'd like to start by making two brief points about the stare decisis and the wisdom of leading this matter to Congress. The first point I'd like to make is, whatever this Court decides, whether it overrules Bellicess and Quill, whether it leaves those in place, whether it does  something in between, Congress can act. Congress can impose whatever solution it believes is appropriate. And indeed, if states are given greater latitude to experiment in this area, to devise different schemes that would balance the interests of out-of-state retailers against the interests of consumers within the states, brick-and-mortar retailers, the states' own interest in acquiring funds, if states can experiment, Congress will have a wider variety of models to look at to decide what aspects of each it would like to choose. The second thing I'd say about Starrick. That doesn't do anything for the interim period and for the dislocation and lawsuits that it will engender until there is a congressional settlement. I mean, the second thing I would say about Quill is that Quill has come to be understood to stand for the proposition that an out-of-state retailer cannot be made to collect state sales tax unless it has employees or a physical facility within the state. That's the meaning that's been attached to the phrase physical presence requirement that the Court used in Quill. I think in context, it's very clear that Quill was not issuing at least an advertent holding about the role of the Internet presence in determining a company's obligation to collect state sales tax. The Court was dealing with Bellis-Hess. It summarized the Bellis-Hess rule as being that if the out-of-state retailer's only contact with the taxing state was delivery of goods and catalogs by mail or common carrier, that was insufficient. And then the Court used the term physical presence requirement, we believe, as shorthand for that principle. But the Court was not saying anything one way or the other about the role of a pervasive Internet presence in establishing sufficient contacts with the state to allow for the collection duty. And a rough analog might be that in the past 15 years, this Court has sometimes acknowledged that its prior decisions had used the word jurisdictional in a less-than-precise manner. And the Court has sometimes said statutes that we previously characterized as jurisdictional are not really that. They are something else. And to be sure, lower courts during the interim were wary of rejecting this Court's statement that a particular statute was jurisdictional, even if it seemed to be unthinking. But the Court, when it righted itself, didn't feel obligated to go through the steps of deciding whether the standards for overruling a prior precedent had been established. It simply said, we used the wrong shorthand, we're not wrong as to the substance, and we'll go from there. And I think the — Roberts. Mr. Stewart, do you believe that there is a constitutional minimum so that even a small business using the Internet may have greater burdens than Amazon, and therefore they have a constitutional claim under your position? Or under your position, can the States impose the burdens on any micro-business, I guess, is what the term has been used? I think our view as to the correct answer, the answer that is most consistent with this Court's, the body of this Court's Dormant Commerce Clause jurisprudence is there's no constitutional minimum. That if you have an out-of-state retailer who is deliberately selling a particular physical good within the State, shipping the good into the State for delivery to the customer and transfer of title, that that is a sufficient basis for subjecting that retailer to the tax collection obligation in the same way that if that single good turned out to be defective, the State could be subject to the — I'm sorry, the retailer could be subject to regulatory burdens imposed by the State, conceivably could be hauled into court to answer for the — Mr. Stewart, isn't that the very kind of question that Congress would be equipped to deal with, establishing a minimum? Certainly, the fact that we don't think there's a constitutional minimum doesn't mean it wouldn't be a good idea and it wouldn't hinder Congress's ability to decide that a minimum should be established. But isn't that essentially a reason why we should leave this to Congress? In other words, from this Court's perspective, the choice is just binary. It's — you either have the quill rule or you don't. But Congress is capable of crafting compromises and trying to figure out how to balance the wide range of interests involved here. Now, the General said Congress hasn't done that, but again, you know, Congress can decide when it wants to craft a compromise and when it doesn't want to craft a compromise, and then Congress, if it decides it wants to craft a compromise, can craft a compromise in ways that we cannot. I would certainly agree that Congress has a broader range of options available to it than does the Court and an ability to devise more nuanced solutions. I don't think, with respect, that it's accurate to characterize the choice before the Court as binary. That is, although it would not be our preferred constitutional rule, it would be open to the Court to say physical presence in the form of employees or physical facilities within the State is not an ironclad requirement and yet not go as far as we've advocated, namely, within the State is sufficient. And one thing that the Court could do is, as it often does, say, we'll look at the statute before us, we will decide whether the nexus that South Dakota has required in the form of economic contacts within the State as a prerequisite to the tax collection duty, that at any rate is constitutionally sufficient, and the Court could leave for another day and for Congress the question, should a lesser link be sufficient as well. The part that's bringing me there, which I really think we can't do after reading these briefs, is what their side puts up a certain specter, which I'm sensitive to, which is that we have four or maybe five giant potential retailers in the country. I mean, there could be a very small number selling virtually anything. And they sell over the Internet, and the hope of preventing oligopoly, et cetera, is small business, which finds it easy to enter. Now, you raise with this entry barriers, and they say a lot, and you say a little. And I don't know if it's a little or if it's a lot. And if it is a lot, there might be ways of putting minimums in that would, in fact, preserve the possibility of competition and the possibility of new entry, stopping the entry barriers from raising too high. Now, that's something the antitrust division could testify about. But they're not going to testify here. And so that's the kind of problem that worries me. Well, let me say two or three things about that. The first is that the GAO report said that something like 80 or 90 of the 100 biggest Internet retailers are paying their state sales taxes. So it's big companies, but it's not just the four or five biggest giants. And so the question is kind of how far down the line do you go? How small does a company have to become in order for the burden of collecting state sales taxes to be substantial as a practical matter? And, you know, our frontline answer is the Dormant Commerce Clause doesn't entitle a fledgling business to the ability to make a profit. If the obligation to collect sales taxes in various states pushes it from making a profit to sustaining a loss, that's not a constitutional defect. But the other thing we would say is nobody on the other side is really seriously contending that the South Dakota law in and of itself places exorbitant burdens. And, indeed, nobody on the other side is even contending that if every state did exactly what South Dakota has done, that the burdens would be exorbitant. The South Dakota law is obviously a test case. You know, it was devised to present the most reasonable incarnation of this scheme. But do you have any doubt that states that are tottering on the edge of insolvency and municipalities, which may be in even worse position, have a strong incentive to grab everything they possibly can? And certainly if the court issued a decision that said physical presence is no room, that adopted our view of the correct answer, that said you make one sale into the state, you are obligated to collect the sales tax, I have no doubt that if the court issued that ruling, many states would adopt regimes that are less hospitable to retailers unless they were stopped from doing that by Congress. My point, though, is that there are various contexts in the Dormant Commerce Clause, particularly in determining whether a state's tax is likely to cause duplicative taxation, in which the court says, what if every state were to do this, wouldn't the burdens on interstate commerce be exorbitant? I have my doubts that that mode of analysis applies here, but even if it did, what the retailers are asking for is something much more than that. They are asking for the court to say that because if every other state adopted a regime that was a much more onerous variant of what South Dakota's statute does, South Dakota's statute must be invalid. There is no basis in the court's Dormant Commerce Clause jurisprudence for holding that. On the issue of duplicative taxation, does the government have a position on the question whether retroactive application of this would be constitutional? In our view, it would be constitutional in part because, as I was saying earlier, we don't understand Quill to have issued an advertent holding with respect to Internet presence. The court, in our view, can simply clarify Quill rather than overrule it. But even if the court felt that retroactive application of the decision, the collection of back taxes raised more substantial constitutional problems, it could simply leave open the possibility of additional pipe-type challenges to back taxes even as prospective application of the laws was sustained. Ginsburg. Mr. Stewart, may I just ask before you finish? What is the government's position on the prospect of prospective overruling of Quill? Then we would have no retroactivity problem. I think the court has issued prospective announcement of constitutional rules in the following sense. That is, the court has determined certainly correctly, I believe, that the court's role is to interpret the Constitution, not to amend it. If the court says in June of this year that the Dormant Commerce Clause means X, it can't say that up until now the Dormant Commerce Clause meant something else. And in that sense, prospective decision-making is inconsistent with the judicial role. However, there are circumstances, and qualified immunity is one of them, where even though the newly announced constitutional rule as a rule applies retroactively, the availability of particular types of relief may depend on whether people were justifiably uncertain at the time. Thank you, counsel. Mr. Isakson. Mr. Chief Justice, and if it please the Court, I'd like to direct my initial responses to some of the questions that Justice Breyer was asking counsel. He pointed out the fact that there were conflicting numbers of people who were  There were conflicting numbers before the Court regarding what is the amount of lost revenue that the States are experiencing. And he said, what should we rely upon? The most authoritative, independent, and extensive study was the one that was done by the General Accountability Office. And the General Accountability Office determined that the private study that was issued in 2009 based on 2006 figures and then updated in 2012 based upon 2009 figures, the GAO indicated that the figures were only one-quarter to one-third of the amount of lost revenue. That wasn't the problem, really. The problem, really, is your brief is filled with stuff. I mean, for example, go to the website, which I went to, that they recommend, and it seems easy to determine what the sales tax was. And you say, but my God, even 12 mistakes in South Dakota. And moreover, there are 10,000 different ones. And you try to do that, and you get it wrong. And either the State assesses $500 penalty for every mistake, which is billions or, you know, a lot. Or the class action lawyers sue you for having paid too much. All right? Your brief is filled with that kind of thing. Their brief says, you know, even if we don't have perfect software, we can develop it. It's not so hard. And when there's a demand for it, we'll do it. And it'll be easy. And you say it's going to cost thousands and thousands of dollars for a small business, maybe all their profits eaten up in hiring accountants. They say, that won't be necessary. We'll do it on software. And, hey, they're not going to – and do it over real prospectively. Okay? Both are logical. How do I decide who's right? Well, part of that problem, Justice Breyer, is the fact that there's no record in this case. And so in trying to determine, even as a matter of stare decisis, whether there is a special justification for overruling Quill, I think the problem that you've identified is that no record has been presented to the Court that would support that substantial justification. Well, how about going back to the very basic issue? And the assertion is that asking an out-of-state seller to collect tax on goods shipped in-state discriminates against interstate commerce. But I see it. Why isn't it, far from discriminating, equalizing sellers? Anyone who wants to sell in-state, whether an in-state shop, an out-of-state shop, everybody is treated to the same tax collection obligation. All who exploit an in-state market are subject to the in-state tax. Why isn't that equalizing rather than discriminating? Well, the Dormant Commerce Clause takes as its principal objective the maintenance of a single national marketplace that is free and accessible to all participants. And the Court found, back in the Bellis-Hess decision in 1967, that the existence of 2,300 different sales and use tax jurisdictions with varying rates, varying exemptions, varying taxability items, varying filing requirements and audit obligations was a burden on in-state commerce. In 1992, when Quill was decided, that figure went from 2,300 to 6,000. That figure today is over 12,000 different jurisdictions. So the concern that the Bellis-Hess and Quill courts had was the notion that a free and open market would be encumbered by that degree of complexity, and that complexity has only worsened over time. Roberts. I don't think you've quite addressed Justice Ginsburg's question, though, which is brick-and-mortar retailers, if they choose to operate in any given jurisdiction, have to comply with that jurisdiction. There are a lot of retailers that have to comply with lots of different jurisdictions' rules. Why should we favor, this Court favor, a particular business model that relies not on brick-and-mortar but on mail order? I understand at Bellis-Hess, the Court was concerned about a nascent, small mail order industry. Those concerns seem a little antiquated today. So maybe if you could address Justice Ginsburg's question. It's the same one I have. So anything you might say on that would be helpful. Thank you, Justice Gorsuch. Borders count. States exercise their sovereignty based upon borders, territorial limits. It's a key part of horizontal federalism in this country. So if there's going to be some standard that determines when is a company subject to the tax jurisdiction of a state, using the territorial limits of that state makes sense. What I think is most significant in looking at this issue is that most of the large retailers, 19 of the 20 largest Internet retailers, already do collect tax because the nature of the market has required them to establish a local presence. Among the 100 top Internet retailers, the collection rate is between 86 and 97 percent. I accept that, but it's still not responsive, counsel. You're just merely pointing out that more Internet retailers are moving toward brick and mortar. Fine. But again, why should this Court favor those who don't over those who do? That's the question. So the United States has suggested that even one sale into the state would require collection. Now, a point-of-sale retailer only has to comply with one jurisdiction where their store is located. But you may know the answer. You may know the answer. I mean, with all these numbers, I mean, one part of the answer to that, in my mind, or not an answer, but help resolve it, is what does it cost for a mandolin seller who sells mandolins on the Internet to sell them in 50 states? How much does it cost him to enter that market? How much did it cost Sears Roebuck? You know, that's an ancient name, but they did all right. And by the way, how much does it cost Amazon voluntarily to comply? And I mean, you see, they're empirical questions that I think are – would help me reach an answer. And if you know them, tell me. No one asked Amazon, what does it cost Amazon? What does it cost the mandolin seller? What are these? Are there different? I don't know. Do you know? Do you know what it costs Amazon? I do not know what it costs Amazon, but I do know that in the Kavanaugh report, which we cite in our briefs to the court, indicated that the cost of just implementation and integration of a software system, before you're dealing with any of the other issues, costs up to $250,000. That the maintenance of a system – Well, but it starts at $12. We know that too, right? So that figure seems a little misleading. I guess the real question that I think Justice Breyer is maybe getting at – and I'd love your help on this too – is the comparative difference, right? After Quill, now states may force Internet providers to provide information like Colorado does that enable them to collect tax from the taxpayer. So the real delta here isn't no duty at all on the Internet supplier versus collecting sales taxes. It's something like Colorado's regime versus collecting sales tax. Do you have any information at all as to which is the lesser burden? I've wondered whether the Colorado regime might be more burdensome to clients like yours who do sales over the Internet than just simply collecting the sales tax itself. The Colorado regime is much less burdensome. Do you have any data on that? Is there anything at all that tells us that? Well, that law has only gone into effect this year. The annual reporting requirement hasn't arrived yet. It doesn't arrive until next year. And so there's no empirical evidence in that regard. But the reporting requirement for the Colorado law simply requires a single annual spreadsheet reporting of all the purchases that were made by Colorado residents. And then the State has the burden of going after consumers. I mean, just in the real world, it's much more efficient, much more likely to yield funds if you go after the seller than if you go after the individual consumer. And I think that speaks, Justice Ginsburg, to the value of a congressional solution. So, for example, what Congress can require is one rate per State for all remote sales. It can require a clearinghouse that can be used for the processing of payments. It can require standard uniform definitions of products so that food and sportswear and clothing doesn't mean one thing in one jurisdiction and another elsewhere. I think an important part of the history of this issue and correcting what I think is the misimpression that's been presented by the United States and the State of South Dakota is that Congress has been active on this issue going back to shortly after the Quill decision. Congress passed the Internet Tax Freedom Act in 1998 which established an advisory commission on electronic commerce which issued a comprehensive report in 2000 detailing the items that the States should address to simplify their tax systems in order to warrant Federal legislation. And it called upon the States to develop that system within five years. The minority report called upon the States to develop that system within two years. The States did not develop that system. A number of States initiated a project called the Streamlined Sales Tax Project to come up with such a uniform system of taxation and over two-thirds of the States' population of more than two-thirds of the national population refused to join and that included all the larger States like New York, Pennsylvania, Illinois, Texas, Florida, California so that Congress has given clear direction to the States the kind of steps that should be taken if they were going to be obtaining from Congress broader tax jurisdiction. The... Can you imagine us saying anything assuming we were, and it's hypothetical to accept your position? Is there anything we can do to give Congress a signal that it should act more affirmatively in this area? I would welcome a decision from this Court that would indicate that Congress should move forward with consideration and action upon legislation. But I think those... I'm sorry, maybe they already have and they've made a decision or at least majorities have made a decision that this is something they're going to leave the way it has been for, whatever, it's 25 years. I think it'd be very strange for us to tell Congress it ought to do something in any particular area. Just a thought. I certainly wouldn't advise this Court on how it should relate to Congress. But I would point out, Mr. Chief Justice, that all of the players that are involved in this issue are in favor of Federal legislation. For the direct marketing industry, as I've pointed out to you, the largest players are collecting tax. They would welcome simplification... But you say that the congressional action should be taken against the background in which this Court has made a statement of constitutional law that is now, especially in light of the cyber age, proven incorrect. So you want Congress to act against the background in which this Court has made an incorrect resolution of the law. That's the assumption you're making. Of course, I know your backup argument is that Quill is correct. I understand that. I'm certainly not suggesting that Congress should be acting to correct this Court's Quill decision. Rather, this Court recognized in its Quill decision that Congress had the power and was better suited to be addressing the issue. But the assumption of many of these questions is that Quill is incorrect, but that that doesn't make any difference. And I'm suggesting that it does make a difference when Congress acts for it to determine what the constitutional rule is as correctly stated by this Court. Now, I understand you think Quill is correct, but most of these questions have just assumed that Quill is incorrect, but what difference does it make? I think that then introduces the issue of stare decisis, because the standard of stare decisis is that even where the Court has ruled incorrectly, there's a value in settled expectations and standing by the decision previously, and that is most powerful when Congress has the ability to correct an error if that error existed. And both the State and the United States deal very lightly with the issue of stare decisis. But if the Court is responsible for Belafonte, and there was from the very beginning strong dissenting opinions, and there was a suggestion that there be a test case, why shouldn't the Court take responsibility to keep our case law in tune with the current commercial arrangements? It's been said that that has been done in the antitrust area. Why are we, Congress, ask Congress to overturn our obsolete precedent? Well, first, the Quill Court did not invite test case litigation on the issue. Justice Kennedy raised that issue in his concurring opinion in the Broll decision. But I think the main reason, Justice Ginsburg, is because of the power of stare decisis, especially on the issue of reliance. If this Court decided to overturn Quill, and I think Justice Alito, giving the two alternatives, either an immediate overturning of Quill or turning to a congressional solution, the result would be chaotic. It's interesting, if you take the statement of Colorado's only member of the House of Representatives, Katie Noem, said, quote, If the Supreme Court rules in South Dakota's favor, it could become a marketplace free-for-all. A South Dakota small business, for instance, could be forced to comply with 1,000 different tax structures nationwide without the tools necessary to do so. That's from a high official representing the State of South Dakota. On the tools, don't you think there's enough incentive in the system that if we did overrule Quill, that entrepreneurs would produce software that would meet the market need? The notion of software being a silver bullet I think is a real misapprehension. The actual looking up of the rate for the 12,000 different tax jurisdictions hardly scratches the surface. Retailers need to map their products against that software, which is rife with errors because common products are defined differently in different states. And it's not merely the 45 states plus the District of Columbia that have sales tax, but there are over 500 home rule jurisdictions that have their own tax bases and definitions. The record retention that's necessary for exempt buyers, exempt transactions, exempt uses is a physical process that needs to be done by the retailer. The filing of the reports are different for the various states. I think what Justice Ginsburg was perhaps suggesting was that all these functions would be essentially taken over by companies like Amazon and eBay and Etsy, that they would do it for all the retailers on their system. Now, there's something a little bit ironic in saying the problem with Quill is that it benefited all these companies, so now we're going to overturn Quill so that we can benefit the exact same companies. But I think that that's the idea, that in fact this would not fall on individual entrepreneurs, that instead they would pay fees to companies like Amazon. The problem, Justice Kagan, is that a number of the functions that I described simply cannot be performed by software. So, for example, if you need to collect resale and other forms of exemption certificates, states require that those be physical papers that you collect. There's no software solution to that. If a state is coming in to audit you, software doesn't solve that for you in any respect. So software can do certain functions and those functions might improve by entrepreneurial initiatives, but they're not going to solve these other issues. And what will happen, because of the substantial expense that's associated with this, is that small and mid-sized companies will be deterred from entering that market. They have a choice. They can either invest in opening a store within the state and foregoing a national market, or they can develop a website and sell to a national market. The Commerce Clause was the promise. Ginsburg. But they say if they open a store within the state, then they're hit by these remote sellers and so their store in the state is suffering. It is the small business person inside the state that's suffering. It's interesting, Justice Ginsburg, that currently over 70% of all small businesses have a website and by the end of 2018 it's estimated that 91% of small businesses will have a website. So the issue here is not between small in-state retailers and out-of-state direct marketers. The real competition is between the large companies who are omni-merchants, who are multi-stakeholders and multi-channel merchants who are increasingly dominating the Internet. And one of the effects if you increase the cost of admission, if you have barriers to entry, one of the inevitable effects is going to be that those small and medium-sized companies are going to be deterred and there will be even greater concentration by the largest retailers. Again, I think that is antithetical to what the objectives of the Commerce Clause were. The arguments that the United States made I think raised some very disturbing notions of what the future would look like. The notion that Mr. Stewart presented that there is no constitutional minimum if the Court overturns Quill that any single sale would obligate a company to then comply with the particulars of that jurisdiction's tax. Would really mean that you'd have most smaller merchants say that's not a function that we can assume at an economic basis. But that was really something that would appeal to Congress to fix because the whole picture Congress doesn't want to look like it's increasing taxes. But fixing something like that would not encounter this same hurdle. The absence of any incentive of the States to seek a congressional resolution in the event that Quill was overruled I think is a major impediment to the notion that Congress would come in and fix the problem. And as Justice Sotomayor pointed out what happens in the interregnum? What happens in the one or two or three year period before Congress acts? And companies are confronted with this dilemma of collection. The notion of a chaotic period preceding Congress coming in to address the issue is as daunting as any in terms of what the consequence of overruling Quill would be. I do want to place special We saw today from the announcement today that Congress can sometimes act with with rapidity. In this instance leading State leaders for example the Director of Tax Policy for the Conference of State Legislatures has publicly stated that if this Court were to overturn Quill there's no reason that the States would favor Federal legislation. So that dynamic is one which I think would likely stalemate Congress rather than allow Congress to act. I do want to make special emphasis on the issue of Stare decisis because since Quill has been in place and there's been a clear explanation of what the standard is for tax jurisdiction literally thousands of companies have said that where that kind of reliance is present and companies have ordered their economic affairs in that reliance that the doctrine of stare decisis is at its acme and he also pointed out that that is especially so where Congress can address the issue. If Congress were to address the issue I think there'd be no doubt that it would be purely prospective in fact I think that's the only thing Congress could probably do is have a prospective law but this court has companies have made their investment decisions based upon a business model understanding what the quill standard requires so the assumption when you're talking about stare decisis is that the decision was wrong so you're saying they've made business decisions on the basis of an erroneous decision when the decision is based on the fact that well that use taxes are not being paid in other words the benefit comes from them not just from the fact that they don't have to collect but from the fact that the decision is correct stare decisis isn't necessary the decision would be standing on its own legs so here you have a situation quite different than other cases where the court has not been able to declare that there was no reliance or no rightful reliance here you have a situation where you have a whole industry that has understood what the rules are I think justice Scalia's term in his concurrence in the court was that there was no reliance on the rules of the court and that is not the case that the court has decided no reliance on the court and that is not the case that the court has decided that there   reliance on the court and  is not the case that the court has decided that there was no